774 P.2d 1335

**In the Matter of a Member of the State Bar of Arizona Donald B. SPEAR, Jr., Respondent.**

**No. SB–88–0009–D.**

Supreme Court of Arizona,
En Banc.

May 16, 1989.

546

Donald B. Spear, Jr., Tucson, pro se.

State Bar of Arizona by Suzette I. Pintard, Phoenix, Law Offices of Michael W.L. McCrory by Michael W.L. McCrory (substituted counsel), Tucson, for State Bar of Ariz.

FELDMAN, Vice Chief Justice.

.In this case we again deal with an attorney's duty to fulfill his ethical obligations while engaging in for-profit business trans-

actions with his client. As in too many similar cases, the attorney's conduct did not comply with the demands of our ethical rules, and we must impose discipline. We have jurisdiction under Ariz. Const. art. 3 and art. 6, §§ (3) and (5), and Rules 46(a), 52, and 53(e), Ariz.R.Sup.Ct., 17A A.R.S. (1988).

## I. PROCEDURE

### A. Proceedings Below

 The State Bar of Arizona charged respondent, Donald B. Spear, Jr., with violating three disciplinary rules of the former Arizona Code of Professional Responsibility, Rule 29(a), Ariz.R.Sup.Ct., 17A A.R.S. (1973).[1] *See* Rule 53(c). The Local Administrative Committee (Committee) heard the two-count complaint on October 21, 1986.[2] Respondent represented himself. Pursuant to Rule 53(c)(4), the Committee filed its report, finding that respondent violated DR 1–102(A)(4) by engaging in conduct involving "dishonesty, fraud, deceit, or misrepresentation." The Committee concluded, however, that respondent did not violate DR 4–101(B)(3) and 5–104(A), pertaining to unethical use of client confidences and unethical business relations with a client. Based on the single violation, the Committee recommended disbarment as the appropriate sanction.

The Disciplinary Commission (Commission) reviewed the case on September 12, 1987, *see* Rule 53(d), with counsel representing respondent. The Commission's report, *see* Rule 53(d)(2), affirmed the Com-

mittee's findings of fact and conclusions of law relating to Count I (DR 1–102(A)(4)). Unlike the Committee, however, the Commission found respondent also violated DR 4–101(B)(3) and 5–104(A), as alleged in Count II. The Commission further rejected the Committee's disbarment recommendation, instead recommending respondent be suspended from the practice of law for six months.

Respondent filed his notice of appeal to this court on November 9, 1987. *See* Rule 53(e). Respondent, appearing *in propria persona*, claims that (1) the Commission's findings are not supported by clear and convincing evidence; (2) the Commission erred by not admitting in evidence an affidavit he offered at the hearing; (3) the Commission could not revive charges that the Committee dismissed; and (4) the Commission's suspension recommendation is an excessive sanction.

### B. Standard of Review

We approach this matter as an "independent trier of both fact and law in the exercise of our supervisory responsibility over the State Bar." *In re Neville*, 147 Ariz. 106, 108, 708 P.2d 1297, 1299 (1985). We do, however, "give deference and serious consideration" to the reports of both the Committee and Commission. *In re Pappas*, 159 Ariz. 516, 768 P.2d 1161 (1988). The State Bar bears the burden of proving by clear and convincing evidence that respondent violated his ethical obligations. Rule 54(c), (d). Clear and convincing evi-

---

**1.** Arizona Supreme Court rules hereafter cited as "Rule ___." Because respondent's conduct occurred before February 1, 1985, former Rule 29(a) (Code of Professional Responsibility) governs this case, rather than current Rule 42 (Rules of Professional Conduct). Order Deleting Rules 27 Through 49, Of The Supreme Court And Substituting Amended Rules 27 Through 121, Rules of the Supreme Court, In Their Place, *reprinted in*, 17A A.R.S. at 212 (1988). However, because the State Bar made its probable cause determination after February 1, 1985, the current rules relating to disciplinary procedures govern here. *See id.* Thus, all references to rules refer to the current rules unless otherwise indicated.

**2.** The complaint charged respondent under the current Arizona Rules of Professional Conduct.

The Local Administrative Committee initially found respondent in violation of the current ethical rules, but issued a supplemental report recognizing that respondent should have been charged under the former disciplinary rules. *See* note 1, *supra.* However, the Committee concluded that the cited ethical rules were substantially the same as the former disciplinary rules, and, therefore, respondent suffered no prejudice from the erroneous citations. The Commission agreed. Moreover, respondent never objected to the erroneous citation and does not raise the issue here. Thus, respondent waived any claim of prejudice. We cite the Code of Professional Responsibility throughout this opinion.

dence is evidence making it "highly probable" that the State Bar's contention that respondent committed professional misconduct is true. *In re Kersting*, 151 Ariz. 171, 172, 726 P.2d 587, 588 (1986).

## II. FACTS

### A. Background

Respondent, a Tucson attorney, began representing the complainant, David Canterman, in approximately 1982. Canterman is a Tucson businessman and entrepreneur with interests in various retail video tape rental and music stores. He has no special tax or real estate training. Sometime around 1982, Canterman's accountant suggested he utilize respondent's services as both a tax attorney and a certified public accountant (CPA). Canterman acted on this advice by contacting respondent after looking through the telephone directory and seeing respondent's advertisement. The advertisement represented respondent as both an attorney and a CPA licensed in Arizona.

### B. The Real Estate Deal

In late 1983, Canterman approached respondent for advice on how to reduce the tax consequences of a $30,000 to $50,000 cash bonus Canterman would receive from one of his business affiliations. Respondent informed Canterman that Spear Investment Co., an Arizona limited partnership of which he was a partner, owned and was interested in selling two duplexes in Tucson. Respondent explained to Canterman that tax benefits accruing from the purchase of the duplexes (depreciation and resultant book loss) would help minimize the negative tax consequences from receiving a large cash bonus so late in the tax year.

Respondent never informed Canterman that previously he had unsuccessfully listed the duplexes with a realtor. With Canterman's interest piqued, in October 1983, he and respondent began to work out the mechanics of the sale. Because Canterman could not close the purchase before the end of 1983, Canterman signed two land sale contracts, supposedly securing tax benefits for the 1983 tax year.

### 1. The Land Contracts

Two admittedly contemporaneous contracts memorialize the November 1983 land deal between Canterman and respondent. The first is the mortgage company's form "Deposit Receipt & Agreement," accurately showing a signature date and payment of earnest money on November 1, 1983. The second is a "Land Contract," drafted by respondent and dated "the 31st day of March, 1983." This contract recites that Canterman had paid the earnest money on March 31. It also provides for a January 14, 1984 closing date, although Canterman was to receive all rents and accept responsibility for mortgage payments and other liabilities as of November 1, 1983.

Respondent testified that he drafted the Land Contract and dated it "March 31" solely to establish the date from which Canterman would be entitled to claim depreciation on the two duplexes from April through December 1983, while Spear Investment would take the depreciation from January through March 1983. This backdated contract is the gravamen of these disciplinary proceedings.

### 2. The Tax Problem

Based on the backdated contract, respondent completed Canterman's 1983 tax returns, claiming a depreciation allowance for the two duplexes for the period April through December 1983. Canterman told the Committee he questioned the legality of the backdated contract before he signed it, but respondent assured him it was legal.

Subsequently, Canterman filed a civil action against respondent and his partners. The action raised various issues arising out of the purchase of the duplexes, including the backdating scheme. During discovery, Canterman sought independent advice concerning the backdated contract. A CPA told Canterman the depreciation allowances were inappropriate. Relying on this advice, Canterman filed amended returns for the 1983 tax year, paying $10,034 in back

taxes, interest, and penalties to the federal and state governments.

## III. THE CHARGES

### A. Count I—Misrepresentation and Fraud

#### 1. *The Backdated Contract*

█ The Committee and Commission found respondent violated DR 1–102(A)(4). This disciplinary rule prohibits an attorney from "engag[ing] in conduct involving dishonesty, fraud, deceit, or misrepresentation." The State Bar contends respondent intentionally misrepresented the date Canterman acquired an interest in the duplexes so Canterman could claim depreciation allowances to which he was not entitled, thus defrauding the federal and state governments. Filing false or fraudulent documents to secure unwarranted tax benefits violates this disciplinary rule. *See In re Goldman,* 124 Ariz. 105, 602 P.2d 486 (1979) (attorney's filing of false documents with bank implicates DR 1–102(A)(4)).

Acknowledging that the contract states it was "entered into on March 31, 1983," respondent admits nothing in the document would alert á reader that he and Canterman actually negotiated, signed, and exchanged partial consideration for the contract in November 1983, or that Canterman did not know of the property until late 1983. Instead, respondent asserts that the backdated contract was only intended to show that he and Canterman agreed the purchase was to be "effective" as of March 31, 1983, and, at worst, he should have inserted such language into the contract. Thus, respondent denies any illegality or intent to defraud the federal or state governments. He claims federal law allows the retroactive transfer of depreciation allowances provided the seller has not claimed the allowances for the same tax period on his own tax return and the buyer acquires an "investment interest" in the property. Respondent argued to the Committee that Canterman had such an invest-

ment interest in the duplexes because the backdated contract assigned the risk of loss to Canterman as of March 31, 1983. Respondent also testified that Canterman could acquire an investment interest in the duplexes merely because "we [the parties to the contract] said he had it." Reporter's Transcript (RT), Oct. 21, 1986, at 111.

Evidently finding such explanations disingenuous, the Committee made, and the Commission approved, the following findings of fact and conclusions of law: (1) respondent intentionally backdated the contract, (2) respondent "calculated" to mislead the revenue agencies into believing the contract was negotiated and agreed upon in March 1983, (3) respondent intentionally misrepresented the validity of the contract's tax benefits to Canterman, and (4) tax depreciation benefits are not retroactively assignable before the buyer and seller at least agree to general sale terms, which in this case did not occur until November 1983.

We believe clear and convincing evidence supports the Committee's factual findings. As noted, respondent does not deny he intentionally backdated the contract. His attempt at a substantive defense of his tax advice is unavailing. Elementary tax law teaches that a taxpayer may not claim a depreciation allowance until he assumes at least some of the benefits and burdens attributable to the depreciable asset. Respondent's own tax authority citations make this clear. *See Kindschi v. Commissioner,* 39 T.C.M. (CCH) 489 (1979) (Dec. 36,483(M)); 5 MERTEN'S LAW OF FEDERAL INCOME TAXATION § 23A.15 (1942–1988); *see also United States v. Everett,* 692 F.2d 596 (9th Cir.1982) (backdating tax shelter investments evidences an intent to defraud), *cert. denied,* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983), and *United States v. Crum,* 529 F.2d 1380 (9th Cir.1976) (same).

Canterman assumed no benefits or burdens until at least November 1, 1983.[3]

---

**3.** The transaction did not close and Canterman did not actually obtain legal title until January 16, 1984. Respondent's contention that Canterman undertook the risk of loss as of March 31,

1983 is, of course, ludicrous. As bar counsel noted, if the duplexes were destroyed by fire in July 1983, some four months after Canterman supposedly had accepted the risk of loss, no

Further, neither the Committee nor the Commission erred, as respondent argues, by focusing on when legal title to the duplexes actually vested in Canterman. The record demonstrates that the Committee and Commission searched in vain for any evidence of Canterman's assumption of some benefits and burdens related to the duplexes. We agree respondent violated DR 1–102(A)(4) because he backdated the contract in an effort to mislead the revenue agencies.

### 2. The Unadmitted Affidavit

■ Respondent claims the Commission erred by refusing to accept the affidavit of H. Jack Heather II, an Arizona CPA. In his affidavit, Heather concludes respondent's tax advice was "not unreasonable." Respondent did not offer the affidavit into evidence before the Committee. Relying on Rule 53(d)(1), which states that "evidence not presented to the Committee shall not be presented to the Commission," the Commission refused to admit the affidavit into evidence. Respondent's only argument for waiving this rule is that "[r]espondent elected not to bring [sic] expert witness to the [Committee] hearing believing that, as Bar Counsel was recommending censure, the maximum penalty to be levied against him was censure." In other words, respondent believed censure was so lenient a sanction that he was not required to mount his best defense.

First, the rules clearly give notice that the Committee has independent authority to recommend sanctions and is not limited to bar counsel's recommendation. *See* Rules 53(c) and (c)(4). Thus, respondent's belief that the Committee could only censure him was unreasonable. Second, respondent's statement that he did not offer an expert's available affidavit because he thought he could only be censured displays an attitude warranting enforcement of Rule 53(d)(1) in this case. Respondent should have taken the possibility of a Committee censure quite seriously. Committee

hearings are a vital part of our disciplinary process, and the prospect of peer censure should dismay every member of the bar. If a member has a valid defense, he must present it vigorously at the earliest possible stage of the proceedings. Indifference to a censure sanction constitutes no excuse for failing to present evidence.

Finally, we have reviewed the affidavit and believe it would have had little if any probative value. It deals with the allocation of valid deductions as between partners in a partnership entitled to claim the deductions. The question before the Committee and Commission related to whether the deduction claimed by Canterman, a buyer, was valid in the first instance. The affidavit thus had little if any relevance. The Commission did not err by refusing to consider it.

### B. Count II—Unethical Business Relations with a Client

Rejecting the Committee's conclusions of law, the Commission found respondent violated DR 4–101(B)(3), which prohibits an attorney from misusing a client's confidences or secrets, and DR 5–104(A), which forbids an attorney from entering into a business relationship with a client who has differing interests, expects the attorney to protect his interests and has not consented after full disclosure. Before we consider the merits of these findings, we must address respondent's challenge to the Commission's *sua sponte* reinstatement of Count II.

### 1. The Commission's Reinstatement of Count II

■ Our rules impose a ten-day time limit within which respondents and bar counsel must file objections to a Committee report. *See* Rule 53(c)(5). Respondent contends the Commission erred in reconsidering Count II despite bar counsel's failure to object. We disagree.

We begin by examining the Commission's powers and duties under this court's

---

contract would have existed in the first place for Canterman would not have agreed to purchase

burned down buildings.

rules. Rule 47(g)(1) grants the Commission authority to "[r]eview the findings, conclusions and recommendations of all panels and hearing committees with respect to any disciplinary matters," and authorizes the Commission to "prepare and forward to the [supreme] court its own findings, conclusions and recommendations...." Because the Commission's powers of review track this court's own review powers, it may make independent findings of fact and conclusions of law. *See* Rule 47(g)(1); *Neville,* 147 Ariz. at 108, 708 P.2d at 1299 (supreme court is independent factfinder). This review power, however, is tempered by appropriate deference to the Committee's factual findings based on witness credibility. *Kersting,* 151 Ariz. at 172, 726 P.2d at 588.

Rule 53 prescribes the general procedures for disciplinary proceedings. Here, too, the Commission receives broad powers of review. It may "affirm, reverse or modify" the Committee's "findings of fact, conclusions of law, or recommendation...." Rule 53(d)(2). We note that this rule differs significantly from the prior procedural rule limiting the Commission's predecessor[4] to either dismissing the charges or accepting the hearing committee's findings of violations and sanction recommendations. Former Rule 36(d). The Commission's predecessor, therefore, could not alter the local committee's factual findings. *In re Geyler,* 114 Ariz. 321, 323, 560 P.2d 1228, 1230 (1977). Finally, Rule 53(d) provides that every disciplinary matter comes before the Commission for review even if no party objects to the Committee's report.

We believe the current rules greatly expand the Commission's powers to alter and reconsider the Committee's findings of fact and conclusions of law. Bar counsel's failure to object to the recommended dismissal of Count II did not prevent the Commission from reconsidering the charges *sua sponte.* Unlike an appellate court, the Commission has jurisdiction to review cases even if no

party objects to the findings below. *Cf. Butler Products Co. v. Roush,* 145 Ariz. 32, 699 P.2d 906 (Ct.App.1984) (appellate courts are without jurisdiction to hear appeals that are filed untimely).

▮ Nor does Rule 53(c)(5) affect the scope of the Commission's powers of review. The rule only provides a timetable within which a party must file an objection should it desire to do so. If bar counsel had filed an objection after the ten-day limit, or filed no objection but still insisted on review, respondent's argument would have more merit. But here, the Commission on its own accord reviewed Count II's allegations.[5]

Finally, we note the Commission apparently believed the Committee applied the wrong legal analysis to the disciplinary rule violations charged in Count II. The Committee seemingly focused on the fairness of respondent's deal with Canterman. The Commission's approach was to examine the extent of the attorney's disclosure of all relevant information. Thus, the Commission's reversal was not based on different assumptions of witness credibility, but rather, on application of a different legal analysis. *Cf. Kersting,* 151 Ariz. at 172, 726 P.2d at 588 (deference given to Committee findings based on witness credibility). In any event, respondent appeared personally before the Commission, and to the extent that the Commission's own findings are based on respondent's credibility, those findings are entitled to appropriate deference.

We hold the Commission had authority to consider and reinstate the charges in Count II. We now examine those charges.

### 2. *Breach of Client's Confidences*

The Commission found respondent violated DR 4-101(B)(3). This rule provides that a lawyer shall not knowingly

---

**4.** The State Bar Board of Governors performed the review functions of the current Disciplinary Commission. *See* former Rule 36.

**5.** Although we agree the Commission has the power to reconsider the Committee's findings

even if bar counsel fails to seek review, we believe the preferable procedure is for bar counsel to explicitly seek review of any counts that the Committee recommends be dismissed.

(3) Use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure.

*Id.* A "confidence" is information protected by the attorney-client privilege; a "secret" is any information gained from the attorney-client relationship that the client asks be kept secret or would be embarrassing or likely to be detrimental if disclosed. DR 4–101(A). We may look to Ethical Consideration (EC) 4–5, which is related to this disciplinary rule, for interpretative guidance. *In re Nulle,* 127 Ariz. 299, 302–03, 620 P.2d 214, 217–18 (1980). EC 4–5 provides:

A lawyer should not use information acquired in the course of the representation of a client to the disadvantage of the client and a lawyer should not use, except with the consent of his client after full disclosure, such information for his own purposes.

Respondent does not deny that he gained access to Canterman's income and tax information only through the attorney-client relationship nor the fact that such information is within the rule's meaning. Rather, respondent contends that he met the rule's burden of full disclosure because he revealed his partnership interest in the two duplexes, told Canterman he was representing the sellers in this transaction, and gave him an opportunity to consult other attorneys.

■ In *Neville,* we held that to satisfy the burden of "full disclosure" under DR 5–104(A), an attorney engaged in business dealings with a client must not only advise his client

about the need to seek independent legal advice, but also [must give] "a detailed explanation of the risks and disadvantages to the client which flow from the agreement."

147 Ariz. at 113, 708 P.2d at 1303 (quoting *In re Montgomery,* 292 Or. 796, 643 P.2d 338 (1982)). This description of full disclo-

sure applies equally well for DR 4–101(B)(3). Adopting different standards of full disclosure for different disciplinary rules would only complicate an attorney's attempted compliance with the ethical rules.

■ Furthermore, even when not acting as counsel in the precise transaction in question, an attorney owes his client a fiduciary duty to explain fully "the legal significance" of all documents affecting the client. This is particularly true where the lawyer is transacting business with his client. *See Miller v. Sears,* 636 P.2d 1183, 1188 (Alaska 1981). In tax matters, an attorney has the responsibility

to *avoid* involving his client in murkey areas of the law if research reveals alternate courses of conduct. At least he should inform his client of uncertainties and let the client make the decision.

*Horne v. Peckham,* 97 Cal.App.3d 404, 416, 158 Cal.Rptr. 714, 721 (1979) (emphasis in original). Respondent met none of these duties here.

■ In this regard the Commission found:

(1) Respondent failed to disclose to his client, Canterman, the risk to the client of entering into the agreement and taking the position taken on the tax returns, all to the personal benefit of the respondent and adverse to the interest of the client.

(2) Respondent inadequately disclosed to client that the IRS might take a different view of the transaction than that of respondent.

(3) Respondent failed to advise the client, Canterman, to seek outside counsel.

Commission Report, 10/28/87, at 3. Our review of the record supports these factual findings.[6]

Even assuming respondent's version of the facts is true, and noting that respondent was not purporting to act as Canter-

---

6. The Committee, although referring to respondent's violation of DR 1–102(A)(4) found that respondent "intentionally misrepresented" the tax validity of the backdating scheme to his client. *See* Part III(A)(1), *supra.* The Committee's findings, therefore, do not conflict with the Commission's.

man's attorney on the sale of the property, he still did not make the full disclosure the disciplinary rules require. Respondent testified before the Committee that he discussed with Canterman the general possibility of an audit, telling him that any negative outcome from the audit may result in penalty and interest charges. RT, Oct. 21, 1986, at 129. This possibility, however, is true of any filed income tax return. Respondent did not testify that he told Canterman about the "aggressiveness" of his tax strategy or that backdating the land contract as support for claiming the depreciation allowance was of questionable legality. Moreover, his Committee testimony shows that respondent did not advise Canterman about the need to seek independent legal or accounting advice. *Id.* at 128. Instead, respondent alleges that he relied on Canterman's apparent acquaintance with other lawyers and accountants and on Canterman's own initiative to seek out advice from people he trusted.[7] *See id.* at 127.

Respondent received confidential information from Canterman. Respondent used that information to structure the land deal in a manner facially favorable to Canterman. Respondent's motive, of course, was not just to help the client. His economic interest in disposing of the property was advanced only if Canterman found it advantageous to buy. Canterman's inducement —and, therefore, respondent's advantage— came from the tax benefits. Respondent and his partners would benefit by selling property they could not sell earlier. Canterman was jeopardized by agreeing to an apparently illegal attempted transfer of tax depreciation allowances. He was not told about the scheme's questionable legality.

Respondent's conduct violated DR 4-101(B)(3). *See Nulle*, 127 Ariz. at 302–03, 620 P.2d at 217–18. Thus, we approve the

Commission's findings and conclusions of law concerning this disciplinary rule.

### 3. *Entering into Business Relations with a Client*

▮ The Commission also found respondent violated DR 5–104(A). This disciplinary rule provides in part:

> (A) A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

This rule requires that if a lawyer and his client have "differing interests," the lawyer must fully disclose those differences and obtain client consent before proceeding with the transaction. The Code of Professional Responsibility defines "differing interests" as

> every interest that will adversely affect either the judgment or the loyalty of a lawyer to a client, whether it be a conflicting, inconsistent, diverse, or other interest.

Code of Professional Responsibility, Definitions, § 1, *reprinted in* former Rule 29(a). Here the differing interests arose by virtue of respondent's status as seller and Canterman's as buyer. *See Pappas*, 159 Ariz. at 523, 768 P.2d at 1168; *see also In re Mercer*, 133 Ariz. 391, 394, 652 P.2d 130, 133 (1982).

The rule further requires that Canterman expected respondent to exercise his professional judgment for Canterman's benefit. The evidence to this effect is clear. The Committee found, and the Commission agreed, that Canterman relied on respondent's statements regarding the backdated contract's supposed tax advantages. Canterman testified he relied on

---

7. The Committee, too, implicitly accepted this version of the facts because it did not find that respondent advised Canterman to seek independent legal advice; it only found that Canterman had a "reasonable opportunity" to seek independent advice.

We note the current conflict of interest rule, ER 1.8(a)(2), requires an attorney to give the client "a reasonable opportunity" to seek inde-

pendent legal advice. We do not believe respondent's conduct meets even this seemingly lesser burden. A "reasonable opportunity" must mean more than just giving a client a copy of a document and relying on the client's initiative to seek independent advice. We leave, however, the current rule's exact parameters for a case squarely presenting the issue.

respondent's legal and tax advice concerning the land deal. RT, Oct. 21, 1986, at 59–60. Both respondent and Canterman agree that respondent acted as his tax attorney prior, during, and after the contract's signing.

Respondent, however, points out he told Canterman he was not representing him in the land deal *per se* and he was acting on behalf of himself and his partnership as sellers of the property. *Id.* at 138. We addressed this issue in *Neville*, where we held that representing the client in the transaction at issue was not a necessary prerequisite for a violation of DR 5–104(A). 147 Ariz. at 111, 708 P.2d at 1302. Instead, we focus on the client's perceptions and whether the client reasonably believes that

> he is dealing with a person whose advice and counsel should be given weight and respect, rather than as one whose words must be taken with that grain of salt that the law expects from people dealing with those who are not fiduciaries.

*Id.* at 112, 708 P.2d at 1303; *cf. Pappas*, 159 Ariz. at 522–23, 768 P.2d at 1167–68 (in determining whether an attorney-client relationship exists at all, focus is on putative client's reasonable belief).

Canterman testified he relied on respondent's advice in this matter. Undoubtedly, respondent's prior and continuing relationship with Canterman, coupled with Canterman's lack of expertise in tax and real estate matters, induced Canterman to believe respondent would exercise his professional judgment on Canterman's behalf and protect him from danger. *See Neville*, 147 Ariz. at 112, 708 P.2d at 1303. Canterman retained respondent for advice on minimizing his tax liability. Respondent, as tax counsel, advised Canterman to purchase the duplexes and seek the retroactive tax depreciation. Under these facts, it would be hypertechnical to say that respondent was not representing Canterman in the land sale. Only on respondent's advice did Canterman purchase the duplexes. Canterman is, indeed, the quintessential client DR 5–104(A) seeks to protect.

As with the DR 4–101(B)(3) allegation, respondent contends Canterman consented to the land transaction after full disclosure of the conflict of interest and all necessary facts. Again, and for the same reasons, we reject respondent's claim of full disclosure. Respondent simply informed Canterman he owned an interest in the duplexes, that there might be a tax audit, and gave Canterman a rough draft of the contract. Respondent's actions fell far short of the full disclosure requirement of DR 5–104(A). Respondent gave neither specific advice about the need to seek independent counsel nor any detailed explanation of the risks involved with backdating the contract.

We realize that we hold the lawyer/businessman to a high ethical standard, particularly where the lawyer chooses to involve his own client in his business. The legal profession can afford no less. *See Pappas*, 159 Ariz. at 522, 768 P.2d at 1167; *Neville*, 147 Ariz. at 112, 708 P.2d at 1303. When a lawyer accepts a client, he accepts that client's trust; he becomes not only the client's advisor, but his protector as well. The better rule may be to prohibit entirely lawyer-client business dealings. *See* C. WOLFRAM, MODERN LEGAL ETHICS § 8.11.1 (1986). The practical difficulties with such an absolute bar, however, prevents its enactment. *See id.* As a general rule, and to minimize ethical problems, no lawyer should allow a client to invest or otherwise participate in the lawyer's business ventures unless the client obtains independent legal advice. Nothing else will protect our profession's integrity and the public interest. *Pappas*, 159 Ariz. at 522, 768 P.2d at 1167.

## IV. DISCIPLINE

### A. Standards

Ours is the ultimate authority in imposing discipline. *Neville*, 147 Ariz. at 115, 708 P.2d at 1306. We impose discipline not to punish, but rather to deter others and protect the public. *Pappas*, 159 Ariz. at 526, 768 P.2d at 1171. We also have recognized the need to achieve more consistency and proportionality in the imposition of sanctions. *Id.* To this end, we consider

the ABA's *Standards for Imposing Lawyer Sanctions* in our disposition of this matter. *See Pappas,* 159 Ariz. at 526–28, 768 P.2d at 1171–73. The Standards provide a useful framework for guiding our sanction decision. We consider (a) the duty violated; (b) respondent's mental state; (c) the injury to the client; and (d) any aggravating or mitigating factors. ABA Standards, *supra,* § 3.0. We examine each violation separately.

### B. Application to Facts

#### 1. *DR 1–102(A)(4)*

■ According to the Committee and the Commission, respondent's misconduct involves fraud and dishonesty, and possibly criminality as well. Standard 5.11(b) recommends disbarment when a lawyer engages in intentional conduct "involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice" law. The standard's commentary teaches that the attorney need not have been charged nor convicted of a public offense. Further, because this is such a serious breach of a duty owed to the public generally, Standard 5.11, *supra* (commentary), the standard demands neither injury nor potential injury to a specific client. Given the Committee's findings of intentional misrepresentation, the preparation of two contracts—one reflecting the correct date and the other misrepresenting the date of execution—and the filing of tax returns based on the latter contract, we hold that Standard 5.11(b) applies here.

Further, we apply Standard 4.61, which recommends disbarment when a lawyer "knowingly deceives" a client with the intent to benefit the lawyer or another, and causes serious injury or potentially serious injury to a client. Respondent knowingly concealed from Canterman the fact that the depreciation allowance might be unavailable under the law and might not withstand scrutiny under audit. This, of course, induced Canterman to purchase the property in which respondent had an ownership interest, thereby benefitting respondent. The client eventually had to pay several thousand dollars in additional taxes, interest, penalties, and legal expenses because of respondent's conduct.[8] This we believe is serious injury within the meaning of the standard. *See* Standards, *supra,* Part II, Theoretical Framework (describing lawyer's conversion of $100 as injury warranting disbarment).

#### 2. *DR 4–101(B)(3)*

We have previously discussed how respondent utilized information gained from the attorney-client relationship to his own advantage and to Canterman's disadvantage. *See* part III(B)(2), *supra.* Standard 4.21 applies here. It reads:

Disbarment is generally appropriate when a lawyer, with the intent to benefit the lawyer or another, knowingly reveals information relating to representation of a client not otherwise lawfully permitted to be disclosed, and this disclosure causes injury or potential injury to a client.

The commentary states disbarment is warranted whenever an attorney "intentionally abuses" the attorney-client relationship by gaining information for the lawyer's own benefit and causing injury to the client. Standard 4.21 (and commentary thereto). That is exactly what happened here. Respondent used Canterman's tax and income figures to induce Canterman to buy property respondent's partnership had previously been unable to sell, even though to do so he had to prepare tax returns exposing Canterman to tax penalties, interest, and possible criminal charges. This was intentional abuse of the lawyer-client relationship within the meaning of the standard. Such an abuse of the relationship is bad enough when the lawyer simply abuses the client's trust to make a profit for himself or another. It is worse when, as in

---

**8.** We reject respondent's claim that Canterman caused his own injury by voluntarily amending his tax return. We will not force a defrauded tax client to await an IRS summons before correcting illegal deductions of which he has notice. To do so possibly exposes the client to fraud charges.

this case, the lawyer uses the information for his own profit even though he thereby jeopardizes the client in the very matter in which he was retained to give help.

### 3. DR 5-104(A)

The Commission found respondent failed to fully disclose the risks inherent in backdating the contract, misrepresented the validity of the depreciation allowances, and that respondent's failure redounded to his benefit and his client's detriment. *See* part III(B)(2), *supra*. Thus, we can only conclude that respondent

> engage[d] in representation of a client knowing that the lawyer's interests are adverse to the client's with the intent to benefit the lawyer or another, and cause[d] serious or potentially serious injury to the client.

Disbarment is appropriate in this situation. Standard 4.31(a). Absent any significant mitigating circumstances, the facts and law of this case militate in favor of disbarment.

### 4. *Aggravating and Mitigating Factors*

■ Respondent suggests that his satisfaction of the negligence judgment against him is a mitigating factor. It is not. *See* Standard 9.4(a) ("forced or compelled restitution" is neither aggravating nor mitigating).

Bar counsel argues the following aggravating factors exist:

■ 1. Respondent had a selfish motive because he gave Canterman incorrect tax advice to induce Canterman to purchase property respondent was unable to sell on the open market. *See* Standard 9.22(b). We have already considered this aggravating circumstance. *See* part IV(B)(2), *supra*.

■ b. Respondent's initial failure to respond to the disciplinary proceedings. *See* Standard 9.22(e). Because the default is not of record, we decline to consider this circumstance.[9]

c. Respondent's claimed tax expertise and Canterman's inexperience in tax matters. We agree this is an aggravating factor. Standard 9.22(h) and (i).

### c. Discipline

Finding only one violation, the Committee recommended respondent be disbarred. It explained this recommendation in its report, essentially concluding respondent knowingly gave the client untenable legal advice and concealed the danger of following the tax advice, thus prejudicing his client on the very matter for which the client sought his help. Consequently, the client suffered injury greater than if he had not consulted the lawyer at all. Given the absence of substantial mitigating circumstances,[10] we would ordinarily disbar. One major factor militating against that action, however, is the Commission's suspension recommendation.

The lack of explanation in the Commission's recommendation puzzles us and we request that in the future the Commission give us the benefit of their views when it makes recommendations significantly different from those of the hearing committee. Lacking that help, this court is persuaded by the recommendations of the Committee and believes that the sanction to be imposed should be much more severe than a six-month suspension. Accordingly, giving some deference to the views of the Commission, we believe the appropriate discipline is a significant period of suspension.

### D. Proportionality

In *In re Goldman*, 124 Ariz. 105, 602 P.2d 486 (1979), we disbarred an attorney

---

9. Bar counsel asserts that this matter originally was assigned to an administrative committee other than the one that actually heard this matter. He further states that after respondent failed to answer the State Bar's complaint within the time prescribed by rule, he moved for a default judgment. *See* Rule 53(c)(1). Then, and only then, did respondent file his answer. Subsequently, the matter was reassigned to the

Committee below, but the motion for default was lost and never acted upon. The Committee refused to grant bar counsel's renewed motion because the default was not a matter of record.

10. Respondent's lack of a prior disciplinary record does little to mitigate his calculated and unethical course of conduct.

for submitting false documents to a bank even though the attorney was not convicted of any crime. In *Pappas*, we suspended an attorney for five years for his failure to appreciate and fully disclose the nature of the differing interests between himself and his clients, whom he had induced to invest in his car rental business. 159 Ariz. at 526–28, 768 P.2d at 1171–73. We note that in *Nulle* we suspended an attorney for only six months for advising his client to file inaccurate documents with the state liquor department and for utilizing confidential client information to his own benefit. 127 Ariz. at 300, 302–03, 620 P.2d at 215, 217–18. However, we decided *Nulle* before the promulgation of the ABA Standards, and must acknowledge that not all prior decisions will comport with the sanctions imposed under the Standards. *See Pappas*, 159 Ariz. at 528, 768 P.2d at 1173. Furthermore, respondent's course of conduct here is much more egregious than Nulle's.

## V. DISPOSITION

We suspend respondent from the practice of law for five years from the date of the mandate. Further, we order respondent to make full restitution to Canterman in accordance with the superior court judgment, as affirmed by the court of appeals in the civil action related to this matter, *Canterman v. Spear*, No. 2 CA–CV 87–0042 (Ct.App. July 21, 1987) (memorandum decision). *See* Rule 52(a)(7). We further order that respondent pay the State Bar of Arizona $1,516.50 in costs and expenses resulting from these proceedings. Rule 52(a)(8).

GORDON, C.J., and CAMERON and MOELLER, JJ., concur.

HOLOHAN, J., retired before the decision of this case.

CORCORAN, J., did not participate in the determination of this case.