882 P.2d 943

**In the Matter of a Member of the State Bar of Arizona, Kenneth McClain ARRICK, Respondent.**

**No. SB–90–0057–D.**

Supreme Court of Arizona,
In Division.

Oct. 13, 1994.

Harrison, Harper, Christian & Dichter, P.C. by Mark I. Harrison and R. Jeffrey Woodburn, Phoenix, for respondent.

Streich Lang, P.A. by Charles W. Jirauch and James A. Ryan, Phoenix, for State Bar of Arizona.

## OPINION

ZLAKET, Justice.

This is a disciplinary proceeding arising out of respondent's representation of two clients. The hearing committee found that respondent violated the Code of Professional Responsibility.[1] It recommended that he be suspended for one year and placed on probation thereafter. The disciplinary commission modified the committee's findings and recommended disbarment. Respondent has been on interim suspension since October 9, 1990. This court has jurisdiction pursuant to Ariz. R.Sup.Ct. 53(e) and is the final arbiter of both fact and law. *In re Neville*, 147 Ariz. 106, 108, 708 P.2d 1297, 1299 (1985).

### I.

The first matter concerns a client we shall call "Mrs. E," who was accused of second degree murder and child abuse arising out of the death of a six-week-old infant she had been babysitting. Respondent was retained by Mrs. E for an initial fee of $7500, with an equivalent amount to be paid if the matter went to trial. We present here a significantly abbreviated version of the underlying facts.

The child's mother left the baby with Mrs. E on the morning of August 16, 1982. She claimed that when she picked him up in the afternoon, the baby was bruised and had difficulty breathing. The child was treated, but died four days later. An autopsy report listed the cause of death as head and neck injuries. Doctors who examined the child on the 16th confirmed that he had head bruises that were likely sustained within the prior 24-hour period and petechia on his eyelids. They concluded that the injuries were non-accidental and consistent with "infant shaking syndrome." They also believed that the child had been struck on the head.

The testimony at the preliminary hearing regarding Mrs. E's statements to police was conflicting. The officer who interviewed her on August 16 testified that, after an initial denial, she admitted hitting the child in the abdomen and upper chest. He also claimed that she told him she shook the baby and might have slapped him. Mrs. E later testified, however, that she never admitted to striking the child. She claimed that she only told the officer she patted the baby's abdomen and shook him gently to help him breathe. The child, she said, was having difficulty eating and breathing, and slept most of the time he was with her. Mrs. E also told the officer that the child had a bump on the head and purple spots on his eyelids when he was left with her in the morning. Witnesses who had seen the baby, however, indicated that he had no marks or bruises before being taken to Mrs. E's.

Respondent had second-hand information that the child's mother was under a great deal of stress in August 1982. Her boyfriend, the child's father, was in jail on rape charges. She and her children were living with a sister, who was apparently ready to evict her for nonpayment of rent. Furthermore, when the mother picked up the baby on the 16th, she was allegedly quite upset because she had been made to wait a long time for a ride home from work. Respondent was also aware that the child had been treated in late July 1982 for head injuries sustained in a "fall." According to the mother, the child's brother had accidentally kicked or pushed him off a table.

Mrs. E had no criminal record prior to the 1982 incident. She had done a good deal of babysitting before that time and had never been accused of child abuse. Moreover, during the period in question, she and her husband were in the process of adopting an eight-month-old child who had lived with them almost since birth. There was no indication that this child had ever been mistreated.[2]

---

1. The misconduct in this case occurred while the Arizona Code of Professional Responsibility, former Ariz.R.Sup.Ct. 29(a), was still in effect. *See* 17A A.R.S. (Supp.1973–1984).

2. Once the Department of Economic Security became aware of the criminal charges against Mrs. E, however, it prevented completion of the adoption proceeding.

In October 1982, respondent informed Mrs. E and her husband that the case would likely proceed to trial and they would need to send him the additional $7500 under the fee agreement. They did so. Then, in March 1983, he met with Mr. and Mrs. E and advised them that, while he had done a thorough investigation and hired experts, he was unable to come up with any viable defenses. He told Mrs. E that her chances of conviction were around 75 percent and that a guilty verdict would result in a mandatory 21–year prison sentence. He recommended that she plead no contest to manslaughter and child abuse and told her that she had a reasonable chance for probation. On March 30, Mrs. E did as respondent advised her. She was sentenced to ten years in prison.

Because the case did not go to trial, Mrs. E and her husband wrote respondent and demanded that he refund the second $7500. He failed to return the money.[3] More importantly, however, respondent admits that, contrary to what he told Mrs. E in advising her to plead no contest, he had not conducted a thorough investigation. For example, although he had names of numerous witnesses possessing relevant information, he either did an inadequate job of interviewing them or failed to meet with them at all. Those witnesses included the officer who interrogated Mrs. E and testified at the preliminary hearing, the medical examiner who performed the autopsy, the doctors who treated the child prior to his death, the baby's mother, and others who had seen the child in the 24–hour period prior to his death.

Respondent also failed to subpoena medical records from the July "fall" until six weeks *after* he recommended to Mrs. E that she accept a plea agreement. He argues that because these records had been inappropriately filed under the name of the child's brother, they likely would not have been located even if he had subpoenaed them earlier. He points to the fact that all records under the *deceased child's name* were obtained by the prosecution and supplied to him. These did not include the records of the July incident. Nevertheless, respondent

was aware of the claimed fall and apparently did nothing to discover why it was not reflected in the records he received from the state.

Furthermore, although he retained a pathologist for the case, respondent failed to provide him with pertinent police and medical records, as had been requested. In fact, that physician advised respondent that he could not rule out the possibility that the July fall was a contributing cause of death, which made the medical records concerning this incident quite important. And, despite a specific request by the doctor, respondent failed to obtain and provide tissue slides that would have enabled the child's fatal cerebral hemorrhage to be dated. Yet, he represented to Mr. and Mrs. E at the March meeting that he had provided all of this evidence to the pathologist, but the doctor was unable to come up with anything helpful to the defense. He also falsely told them that the physician felt the July fall was too "remote" to have contributed to the death.

Finally, respondent did not hire an investigator until January 1983—one month after the first scheduled trial date. Even then, he only instructed the investigator to interview character witnesses in anticipation of a sentencing hearing.

In August 1984, after serving 14 months in prison, Mrs. E's petition for post-conviction relief was granted on the basis of ineffective assistance of counsel with respect to her plea agreement, and she was released. In May 1986, respondent and his insurance company settled a malpractice claim brought by Mr. and Mrs. E for $325,000 in cash, plus periodic payments throughout her lifetime.

The hearing committee and commission both concluded that respondent's investigation of Mrs. E's case was "totally inadequate." Respondent himself admitted that the defense was "grossly below what was expected of an attorney." Our review of the record confirms that respondent's representation was poor indeed. We therefore find that respondent violated DR 6–101(A)(2) (lawyer shall not handle a legal matter with-

---

**3.** Respondent and his attorney in the malpractice action subsequently filed against him have assert-

ed that Mr. and Mrs. E rejected an offer to return half the money.

out adequate preparation) and DR 6–101(A)(3) (lawyer shall not neglect a legal matter).[4]

The hearing committee found that "a proper handling of the case by Mr. Arrick would have, in all probability, obtained a better result" for Mrs. E. Committee Report Finding 48 at 10. Respondent argues, however, that no causal connection was shown between the harm to Mrs. E and his representation, since the evidence clearly pointed to her guilt.[5] That argument is of little value here. Only the Almighty knows what the outcome would have been had respondent given this woman the representation to which she was entitled and for which she and her husband paid. Mrs. E had a right to an adequate defense. *State v. Watson,* 134 Ariz. 1, 653 P.2d 351 (1982) (criminal defendants are entitled to at least minimum standards of competence). She did not receive it. It is beyond question that there was potentially exculpatory evidence available to the defense that was never discovered or evaluated.

■ In assessing ethical sanctions, while actual harm to the client is one factor to be considered, *potential harm* must also be weighed. *See In re Tarletz,* 163 Ariz. 548, 554, 789 P.2d 1049, 1057 (1990) (citing American Bar Association's *Standards for Imposing Lawyer Sanctions,* Standard 3.0 (1986)). Respondent should have known that his failure to adequately investigate posed possible serious consequences for Mrs. E. Thus, we are unimpressed with his attempts to persuade us that this is a case of "no harm, no foul." Furthermore, we are unwilling to ignore Mrs. E's release from prison based on the judicial finding of respondent's ineffective assistance. The court granting such relief must necessarily have found a reasonable probability that "but for counsel's unprofes-

sional errors, the result of the proceeding would have been different." *State v. Lee,* 142 Ariz. 210, 214, 689 P.2d 153, 157 (1984) (quoting *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674, 698 (1984)). We choose not to relitigate these issues. Neither are we comfortable with respondent's suggestion that we ignore the court's post-conviction findings and supplant them with our own.

Respondent's second argument has more merit. He asserts that because of his alcoholism he did not have the intent to violate four of the disciplinary rules found by the committee and commission. Three of those rules, DRs 7–101(A)(1), (2), and (3), deal with the duty to zealously represent one's client and specifically require a finding of intent. The fourth prohibits a lawyer from engaging in "conduct involving dishonesty, fraud, deceit, or misrepresentation." DR 1–102(A)(4).

■ We agree that the existence of a mental impairment or illness affects the analysis of whether a person acts intentionally. The ABA Standards define "intent" as "the conscious objective or purpose to accomplish a particular result." ABA *Standards for Imposing Lawyer Sanctions* at 17 (1991 ed.). A person whose conduct results from a mental impairment or condition might not have the "conscious objective" to engage in such behavior. According to expert testimony relied on by the committee, "a chronic alcoholic is mentally and emotionally impaired." *See* Record of Transcript at 16. This expert, a clinical psychologist who had treated respondent since 1977, also confirmed that throughout the period in question (April 1982 through July 1985), respondent was an active, chronic alcoholic.[6]

---

4. Although respondent concedes that his conduct also breached DR 1–102(A)(1), which formerly stated that "a lawyer shall not ... [v]iolate a Disciplinary Rule," we think such an offense is at best redundant and therefore not helpful to our analysis here.

5. Respondent contends that the committee and commission erroneously based their conclusions on poorly supported expert testimony by an attorney who had no involvement in the case. He urges this court to instead consider an affidavit

by the prosecutor in this matter, who apparently concluded that no amount of investigation would have altered the outcome for Mrs. E.

6. There was also testimony by respondent that he periodically used drugs between 1982 and 1985. In this regard, the hearing committee specifically found that his use was "limited," and did not cause or contribute to the misconduct under consideration. It did not consider the drug use to be a mitigating factor. Committee Report at 21.

Although there is no evidence that respondent was intoxicated on specific occasions when he dealt with Mrs. E, the committee found that he "suffered from alcoholism over a long period, which at various times impacted upon his ability to practice law, and *which impaired his judgment during the period of time he represented*" her. More importantly, there is no clear and convincing proof that respondent *intentionally* failed to represent his client. *See In re Lincoln*, 165 Ariz. 233, 235, 798 P.2d 371, 373 (1990) (disciplinary violations must be found by clear and convincing evidence). Rather, it appears more likely that his omissions were negligent and caused in large measure by his addiction to alcohol. We therefore find the evidence insufficient to support violations of DRs 7–101(A)(1), (2) or (3).

We do agree with the committee and commission, however, that respondent's actions constituted a breach of DR 1–102(A)(4). Although we concur with respondent that this is essentially a negligence matter, we cannot ignore that he actively deceived Mr. and Mrs. E in an attempt to cover his negligence. The committee specifically found, and the evidence clearly and convincingly shows, that respondent's "communications and representations to his client at the March, 1983 meeting were dishonest, misleading, fraudulent, or deceitful." Committee Report Finding 41 at 9. Thus, while the initial misconduct may not have been intentional, the subsequent attempt to deceive Mrs. E was clearly *intended* to achieve that result.[7]

Finally, we agree that respondent violated DR 2–106(A) (lawyer shall not collect a clearly excessive fee) by not returning the second $7500. Because there was no trial, he was not entitled to this money under the terms of the fee agreement.

---

7. In considering an appropriate sanction, we must be mindful that denial and deception are unfortunate but predictable behaviors associated with the disease of alcoholism. And, as we held in *In re Hoover*, 155 Ariz. 192, 198–99, 745 P.2d 939, 945–46 (1987), although it may not necessarily serve as a complete bar to discipline, a mental condition or illness must be considered in determining the kind of discipline to be imposed.

## II.

"Mrs. L" hired respondent in February 1981 to represent her in a dispute with the Chicago Title Company. That company was the collection agent on a piece of property that Mrs. L's ex-husband had recently sold. It claimed that he owed $6500 to satisfy a judgement lien attached to the property, and it instituted a garnishment action against itself to collect this sum out of the funds it was receiving for him. Mrs. L, who possessed a power of attorney from her ex-husband, had negotiated the sale and signed documents on his behalf. Mrs. L and respondent orally agreed that his fee to contest the garnishment would be one-third of the $6500. Respondent successfully defeated the garnishment action. He then began collecting the payments on Mrs. L's behalf, retaining his one-third interest pursuant to their agreement.

There ensued over the next few years a series of defaults by the purchasers of the property. Each time this occurred, respondent instituted foreclosure proceedings and the payments would be brought current. Finally, it became necessary to go through with the foreclosure. The evidence is undisputed that respondent intentionally did not serve everyone who had an adverse interest in the property. This was apparently part of a strategy devised by him for maximizing the benefits to his client. Without attempting to explain the intricacies of respondent's plan, we note only that the hearing committee found it was not unreasonable. Nonetheless, it failed.

Mrs. L relied on respondent's advice throughout these proceedings. She allegedly agreed with respondent's strategy, but the extent to which he explained it in obtaining her consent is unclear. Mrs. L primarily recalled that he told her she would financially benefit from his actions. It was on this basis

---

Because our primary purpose in these cases is to protect the public and the justice system, rather than to punish the attorney, *id.* at 197, 745 P.2d at 944, it may be necessary to impose a sanction even where mental impairment has prevented the formation of specific intent. Obviously, when the impairment continues to exist, a lawyer cannot be permitted to maintain or resume the practice of law.

that she gave him approval. She later sued respondent for malpractice in connection with this transaction and recovered a $35,000 settlement.[8]

The hearing committee and the commission found that respondent violated DR 7–101(A)(3) (intentionally prejudicing or damaging a client) and DR 6–101(A)(1) (handling a legal matter that he was not competent to deal with) in his representation of Mrs. L. We disagree with the DR 7–101(A)(3) finding for the same reasons set forth in our analysis of the matter pertaining to Mrs. E. Respondent's chronic alcoholism during this period again tends to negate a finding, by clear and convincing evidence, of intent.

■ As to the second violation, it was the feeling of the committee that respondent had little knowledge of real estate law and lacked the necessary competence to handle this type of case. Without deciding whether respondent was qualified to assume the representation, we note that DR 6–101(A)(1) is inapplicable because it was never adopted in Arizona. *See* DR 6–101(A), former Ariz.R.Sup. Ct. 29, 17A A.R.S. (Supp.1973–1984).[9]

We cannot say that respondent's strategic decision was clearly erroneous. Our review of the evidence persuades us, however, that he acted without the fully informed consent of Mrs. L, in that he did not adequately advise her of potential adverse consequences if the strategy failed. More importantly, however, the record points to a persistent pattern of insufficient communication with his client throughout these matters.

In the old code, there was no disciplinary rule resembling ER 1.4(b) of the current Rules of Professional Conduct, which states that "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Rule 42, Ariz.R.Sup.Ct. However, DR 6–101(A)(3) prohibited a lawyer from neglecting "a legal matter entrusted to him." We agree that the nature of

respondent's misconduct fell within this prohibition.

We turn next to the charge that respondent acted improperly by claiming a one-third interest in the note and deed of trust and by inserting himself, apparently inadvertently, as a plaintiff in the foreclosure suit. The hearing committee found no violation here, but the commission found breaches of DR 5–101(A) (refusing employment when own interests may impair independent professional judgment) and DR 5–105(A) (refusing employment when interests of another client may impair independent professional judgment).

■ We agree that this determination turns on witness credibility. Respondent claimed that he disclosed the full nature of his financial interest to Mrs. L in compliance with the "consent after full disclosure" exception to DR 5–101(A). Mrs. L testified that he did not. Because the committee found no violation, it must have believed respondent. On issues of witness credibility, we have held that it is proper for the commission and this court to defer to the hearing committee. *In re Spear*, 160 Ariz. 545, 551, 774 P.2d 1335, 1341 (1989).

We also find that respondent did not violate DR 5–105(A). That provision deals with the representation of multiple clients and is inapplicable here.

### III.

In addition to the above matter, Mrs. L met with respondent in February 1981 to discuss a dispute she was having with the Northland Insurance Company (Northland). Her ex-husband owned an 18–wheel tractor-trailer that was destroyed in a fire. Northland, which insured the truck, denied his claim on the ground that the fire had been intentionally set. Respondent agreed to represent Mrs. and Mr. L, and they signed a contingent fee agreement.

---

**8.** The committee concluded that Mrs. L ultimately "suffered no monetary damages" by reason of respondent's conduct because she was made whole by the settlement.

**9.** The state bar urges that this finding was in fact a "typographical error" and that the "real" finding pertained to DR 6–101(A)(3), which we discuss below. Because we cannot discern whether the reference to DR 6–101(A)(1) was a mistake, our discussion briefly addresses it.

After some initial correspondence in early 1981, Northland's attorney sent respondent a letter detailing the evidence that implicated the insureds in the burning of the truck. From 1981 to 1984, respondent made no reasonable inquiry about the claim. He interviewed no witnesses, hired no investigator, and did not meet with Mr. L. He also lost important documents given to him by Mrs. L and Northland's attorney. In 1984, Mrs. L sent several letters to respondent asking him to take action on this matter. Finally, in August 1984, respondent filed suit, although he still had not conducted a reasonable investigation. He stated that he did so only because of Mrs. L's "persistence" and because he was afraid the statute of limitations was about to run. The suit was dismissed with prejudice in May of 1985.

The committee and commission both found that respondent violated DR 6–101(A)(2) (handling a legal matter without adequate preparation) and DR 6–101(A)(3) (neglecting a legal matter), and that his signature on the pleadings violated Rule 11, Ariz.R.Civ.P. Respondent does not contest these findings.

## DISPOSITION

The committee recommended that respondent be suspended for one year. In light of the fact that he has been on interim suspension for a full four years, this recommendation is essentially moot. We are thus left with the commission's recommendation that respondent be disbarred pursuant to ABA Standard 4.41(b) (disbarment generally appropriate when lawyer knowingly fails to perform services and causes serious or potentially serious injury). Respondent argues that disbarment is inappropriate because his ethical violations were caused by alcoholism and he has successfully been in recovery since 1985.

Respondent regularly attends Alcoholics Anonymous meetings and has sponsored other AA members. One expert testified that the chance of respondent relapsing into active alcoholism is generally less than the average occurrence of addiction in attorneys. Another testified that he has "a remarkably good chance of staying straight." Furthermore, the experts testified that any relapse

would be easily and quickly detected if respondent were monitored by AA and the State Bar Membership Assistance Committee.

The hearing committee concluded that respondent "was physically and mentally impaired during the relevant time periods because of alcoholism." Committee Report at page 21. It also found that he was rehabilitated. We concur. Furthermore, we find that he is likely to stay sober as long as he continues to participate in Alcoholics Anonymous and is monitored by the Bar.

■ The purpose of discipline is "to protect the public from further acts by respondent, to deter others from similar conduct, and to provide the public with a basis for continued confidence in the Bar and the judicial system." *In re Hoover*, 155 Ariz. 192, 197, 745 P.2d 939, 944 (1987). We believe that purpose is served as long as respondent remains sober. Thus, while we "deal very sternly with any lawyer who neglects his clients while abusing [substances]," *In re Rivkind*, 164 Ariz. 154, 158, 791 P.2d 1037, 1041 (1990), we also "seek to create an incentive to attorneys who reform and rehabilitate themselves." *Id.* at 160, 791 P.2d at 1043.

The American Medical Association recognizes alcoholism as an addictive disease. American Medical Association, *Encyclopedia of Medicine* 81 (Charles B. Clayman ed., 1989) (defining alcohol dependence as an "illness characterized by habitual, compulsive, long-term, heavy consumption of alcohol and the development of withdrawal symptoms when drinking has stopped suddenly"). Alcoholism is especially prevalent in the legal profession. One expert testified at respondent's hearing that 18% of all Arizona lawyers are practicing alcoholics.

■ Under *Rivkind*, 164 Ariz. 154, 791 P.2d 1037, an attorney who refuses to address his or her substance abuse problem may not be entitled to leniency in a disciplinary proceeding. On the other hand, when a lawyer demonstrates a sincere, long-term commitment to health, we are of the opinion that he or she deserves to have the matter considered in mitigation. Respondent has done just that. We believe, therefore, that

disbarment here would be overly harsh and would do little to encourage attorneys to seek rehabilitation instead of continuing in denial.

In making its recommendation, the commission noted that respondent had several failed attempts at rehabilitation prior to his latest period of sobriety. We prefer to focus on his more recent success. Assuming he has not relapsed since this matter was submitted to us, respondent has by now apparently been clean and sober for *nine consecutive years*. He has also been a leader in helping others with their addictions. These facts give us considerable hope and optimism for his future sobriety. We therefore find that respondent's alcoholism, accompanied by his subsequent long-term rehabilitation, constitutes strong mitigating evidence. *See In re Kersey*, 520 A.2d 321 (D.C.App.1987) (discussing in depth the disease of alcoholism and the probable effect of various sanctions when encouraging attorneys to seek rehabilitation is the goal); *see also Hoover*, 155 Ariz. 192, 745 P.2d 939 (mental impairment or condition counts in mitigation); *In re Couser*, 122 Ariz. 500, 596 P.2d 26 (1979) (same); ABA Standards 9.32(h) (physical or mental disability or impairment mitigating factor) and (j) (interim rehabilitation mitigating factor).

The hearing committee and commission found seven aggravating factors: (1) a prior disciplinary offense, *see In re Arrick*, 161 Ariz. 16, 775 P.2d 1080 (1989), (2) dishonest or selfish motives, (3) a pattern of misconduct, (4) multiple offenses, (5) vulnerable victims, (6) substantial experience in the practice of law, and (7) indifference to making restitution. *See* ABA Standard 9.22. Although respondent initially did not intend to harm his clients, we adopt the finding related to dishonest or selfish motives because of his deliberate misrepresentations to Mrs. E, which were clearly designed to cover his negligence. We also agree that the inappropriate retention of her fee indicates such a motive.

We note, however, that respondent's prior offense was committed during the same general time frame and that it also resulted in large measure from his chronic alcoholism. Although that does not eliminate this factor from our consideration, it tempers its impact somewhat. The same rationale applies with respect to the pattern of misconduct and multiple offense factors.

We agree that Mrs. E was a particularly vulnerable victim. The testimony established that she had a low I.Q. and a hearing disability. There is no evidence that Mrs. L was especially vulnerable.

With respect to the "substantial experience" factor, we have recently suggested that its use may deserve closer examination. *See In re Shannon*, 179 Ariz. 52, 68, 876 P.2d 548, 564 (1994); *Id.* at 82, 876 P.2d at 578 (Zlaket, J., dissenting). In any event, however, that factor would seem to have little application here. This lawyer's conduct was substantially the result of his chronic alcoholism. No amount of "skill" or "experience" would likely have prevented what happened.

Finally, although there was conflicting testimony regarding respondent's willingness to return at least part of the fee in question, the fact that he did not causes us to affirm the finding regarding his reluctance to make restitution.

■ In balancing the seriousness of respondent's conduct with the important goal of encouraging rehabilitation, we conclude that the four-year interim suspension he has already completed is appropriate and sufficient.[10] This result may appear somewhat harsher than those in other disciplinary cases involving substance abuse. *See In re Loftus*, 171 Ariz. 672, 832 P.2d 689 (1992) (two-year suspension imposed for ethical violations committed during period of alcoholism); *In re Nicolini*, 168 Ariz. 448, 814 P.2d 1385 (1991) (two-year suspension imposed for violations attributable to alcohol and cocaine abuse when lawyer took steps to rehabilitate); *Rivkind*, 164 Ariz. 154, 791 P.2d 1037 (lawyer convicted of possessing drugs given two-year suspension when drug use did not affect his work and lawyer had made efforts

---

**10.** We also note that this term is longer than the three-year suspension sought by the state bar as

an alternative to disbarment.

to rehabilitate himself). We believe, however, that the longer suspension is warranted in light of the seriousness of the charges against respondent, particularly those relating to his representation of Mrs. E. We emphasize that the discipline imposed here would have been even more severe had there not been evidence of respondent's sincere and apparently fruitful efforts at rehabilitation.

We therefore impose a retroactive suspension of four years, from October 9, 1990, to October 8, 1994. Provided that respondent is, and has been, free from the use of alcohol and drugs, he may now apply for reinstatement pursuant to the rules governing such procedure. *See* Rules 71 and 72, Ariz.R.Sup. Ct. If he is reinstated, we order that he immediately be placed on probation for a term of two years, on the following conditions: he shall abstain completely from the use of alcohol and drugs; and he must continue his participation in Alcoholics Anonymous and the Arizona State Bar Membership Assistance Program. In addition, he shall be monitored during this probation by the State Bar and shall submit to any testing it finds appropriate. The period of probation is subject to extension as provided for in Rule 52(a)(6)(A), Ariz.R.Sup.Ct. Pursuant to Rule 52(a)(8), we also order respondent to pay the costs associated with these proceedings.

MOELLER, V.C.J., concurs.

MARTONE, Justice, dissenting in part.

I join in much of the majority's opinion and in the disposition, but disagree with the court's analysis of the role of intent in the prior disciplinary rules, *ante,* at 139–140, 882 P.2d at 946–947.

The majority acknowledges that "there is no evidence that respondent was intoxicated on specific occasions when he dealt with Mrs. E." *Ante,* at 140, 882 P.2d at 947. I gather, then, that it is his status as an alcoholic and illegal substance abuser that causes him to be such a bad lawyer, and not a specific act of intoxication or drug use which might otherwise negate intent. But no specific intent to violate the rules or harm the client was required, as long as the act itself was voluntary. There is no evidence that the acts were not intentional, unless we conclude that one's status as an alcoholic or drug abuser is generally available to negate intent. But we know that cannot be the case. While intoxication at the time of a specific act can negate intent, the mere status of being an alcoholic is insufficient. I would hold that respondent did indeed violate DR 7–101(A)(1), (2), and (3).