783 P.2d 774

**In the Matter of a Member of the State Bar of Arizona, Joseph E. FRESQUEZ, Respondent.**

**No. SB–88–0046–D.**

Supreme Court of Arizona,
En Banc.

Sept. 26, 1989.

Nicholas Udall, and Browder & Kenney, P.C. by Robert W. Browder, Phoenix, for respondent.

Harriet L. Turney, Chief Counsel, Phoenix, State Bar of Ariz.

## OPINION

CORCORAN, Justice.

On May 4, 1987, the State Bar of Arizona filed a complaint against respondent. A hearing committee convened on January 29, 1988, to consider 4 counts of alleged misconduct arising out of the following factual scenario.

In October 1983, Bridget and Louis Castro's home was flooded. The flooding allegedly occurred due to the negligence of employees of the City of Flagstaff. The Castros hired respondent to represent them in their claim against the city. Respondent apparently contacted the city's insurer, but the events that followed are disputed.

### The "lawsuit"

Counts 1 and 2 of the State Bar complaint arose out of respondent's representation of the Castros. According to the Castros, respondent initially told them that their case was set for arbitration, and later informed them that he had filed a lawsuit. Respondent advised them of upcoming trial dates; however, he would then call them a day or two before the scheduled trial and tell them the trial had been "bumped." In fact, respondent had neither scheduled arbitration nor filed a lawsuit.

Dissatisfied with respondent's handling of their case, the Castros sent a letter to the State Bar on March 4, 1985, requesting an investigation of respondent's actions. After reviewing the letter, the State Bar notified respondent of the allegations on May 3, 1985, and requested a response. Respondent failed to answer within the allotted time.

Count 1 of the State Bar complaint alleged that respondent failed to represent the Castros diligently, in violation of Disciplinary Rule 6–101(A)(3), Arizona Code of Professional Responsibility.[1] Count 2 alleged that respondent made false statements to the Castros about filing the complaint and about trial dates, in violation of DR 1–102(A)(4).[2]

At the subsequent hearing, the State Bar presented witnesses to corroborate the Castros' account. Louis' supervisor testified that Louis had requested time off from work several times to attend trial, only to inform him later that the trial had been postponed. Bridget's friend testified to similar conversations she had with Bridget about trial dates and postponements. Respondent objected to this testimony as inadmissible hearsay.

In his testimony before the hearing committee, respondent denied ever telling the Castros about a scheduled arbitration or trial, or that he had filed a lawsuit. He testified that the Castros delayed in furnishing him an inventory of their possessions, which he needed in order to compute a claim. He also testified that the Castros could not agree on how to pursue their claim: Louis wanted to sue the city to obtain the highest possible recovery, while Bridget desired a quick settlement.

### The back-dated letter

Count 3 of the complaint concerns a letter that respondent sent to the State Bar

---

1. The misconduct complained of in Counts 1 and 2 occurred before February 1, 1985, and is governed by the Disciplinary Rules of the Arizona Code of Professional Responsibility. The conduct forming the basis of the remaining counts occurred after February 1, 1985, and is governed by the Ethical Rules of the Arizona Rules of Professional Conduct. *See* Order Deleting Rules 27 Through 49, Of The Supreme Court, And Substituting Amended Rules 27

Through 121, Rules Of The Supreme Court, In Their Place, 139 Ariz. LXXIX (effective February 1, 1985).

DR 6–101(A)(3) provided: "A lawyer shall not ... [n]eglect a legal matter entrusted to him."

2. DR 1–102(A)(4) provided: "A lawyer shall not ... [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

during its investigation. The letter was signed by Louis Castro and dated May 2, 1985. In the letter, Louis purportedly absolved respondent of responsibility for any wrongdoing and requested that the State Bar drop all charges against him. Respondent originally denied having anything to do with the letter; later, he acknowledged that someone in his office must have helped Louis to prepare it, but he could not identify the employee. At the hearing, respondent took the position that he prepared the letter according to Louis' direction, but claimed that he did not remember doing it.

Evidence offered at the hearing contradicts the May 2 date of the letter. Louis testified that he went to respondent's office in July 1985, at respondent's request. Louis and Bridget were in the middle of marriage dissolution proceedings at this time. Respondent told Louis that he could help him to obtain custody of the Castros' children and to reconcile with his wife; however, respondent required that Louis first sign a paper enabling respondent to represent him. Louis testified that respondent covered the text of the letter with his hand and directed him to sign.

Other evidence supports the Bar's contention that Louis did not sign the letter on May 2. On April 26, 1985, Louis violated a temporary restraining order and fled with his two children to Colorado. On April 29, he requested money from his father, who sent Louis a $300 money order, which Louis cashed at a Fort Collins, Colorado bank on May 1. Louis gave an account of his stay in Fort Collins, detailing his activities on May 2 and the following days. No one involved in the case remembered seeing Louis or the children from the time they left Flagstaff until about May 6.

Based on this evidence, Count 3 of the complaint alleged that respondent prepared the letter dated May 2, 1985, and presented it to Louis for his signature, knowing that material statements in the letter were false, in violation of Ethical Rule 8.4(c).[3]

### The $300 payment

On July 11, 1985, respondent met with Louis' sister and gave her a $300 check drawn on respondent's trust account. Respondent testified he gave the money to Louis' sister, "suspecting" the money would go to Louis. As alleged in Count 4 of the complaint, this $300 payment was part of a pattern of inducement used by respondent to procure Louis' signature on the letter dated May 2, 1985, in violation of ER 8.4(c).

### The false affidavit

The State Bar served respondent with the complaint on May 20, 1987. Respondent failed to answer timely. Consequently, on June 23, 1987, State Bar counsel filed a Notice of Failure to Answer, requesting that the hearing committee deem the allegations of the complaint admitted and take appropriate action. *See* rule 53(c)(1), Rules of the Supreme Court; *In re Zang*, 158 Ariz. 251, 252, 762 P.2d 538, 539 (1988).

On June 25, 1987, respondent filed his answer to the complaint and a response to the Notice of Failure to Answer. He pleaded excusable neglect, blaming his docketing secretary for failing to docket the complaint and the answer date. In support of his response, respondent attached an affidavit signed by his docketing secretary.[4] At the hearing, the docketing secretary affirmed the affidavit's statements, but testified that she was not served with the complaint and knew nothing about it until respondent presented her with the handwritten affidavit and asked her to type and sign it.

Two days before the hearing, the State Bar moved to amend the complaint to include two additional counts. Proposed Count 5 alleged that, in an attempt to justify his failure to respond timely to the com-

---

3. ER 8.4(c) provides: "It is a professional misconduct for a lawyer to ... engage in conduct involving dishonestly, fraud, deceit or misrepresentation."

4. The hearing committee accepted respondent's answer on July 7, 1988. Two days later, Mr. Udall entered his appearance on respondent's behalf. Mr. Browder entered his appearance as co-counsel on August 4, 1988—two weeks after the Commission filed its report.

plaint, respondent prepared and filed a false affidavit with the State Bar, in violation of ER 8.4(c). Proposed Count 6 alleged that respondent violated ER 8.4(c) by utilizing funds from his firm's trust account to make the $300 payment to Louis' sister. The committee granted the motion to amend during the second day of the hearing. *See* rule 55(a) ("At any time prior to the conclusion of the disciplinary hearing, bar counsel ... may move to amend the pleadings").

### Decision of the Hearing Committee

The hearing committee found that clear and convincing evidence supported the allegations contained in Counts 2 through 5. It recommended dismissal of Counts 1 and 6. The committee found that

> respondent's numerous lies to the State Bar and before the committee under oath, and his lies when truth would have served him better, utterly destroyed his credibility with the committee....

Finding several aggravating factors and no significant mitigating factors, the committee recommended disbarment.

### Proceedings before the Disciplinary Commission

On June 28, 1988, 10 days before the scheduled oral argument in front of the Commission, Louis gave a sworn statement to an investigator hired by respondent's counsel. The statement affirmed the substance of the May 2 letter. The following day, Louis signed an affidavit to the same effect. Neither the statement nor the affidavit explain Louis' prior inconsistent testimony before the committee. Two days prior to the oral argument before the Commission, respondent moved to supplement the record or remand the matter to the hearing committee based on Louis' alleged recantation of his testimony.

The Commission heard argument on respondent's motion and the State Bar's cross-motion to strike the statement and affidavit. Citing rule 53(d)(1), the Commission denied respondent's motion and struck the proffered evidence, stating that the material "is not deemed newly discovered evi-

dence." The Commission then adopted the committee's findings of fact and conclusions of law, but rejected the recommended sanction. Citing *In re Kleindienst,* 132 Ariz. 95, 644 P.2d 249 (1982), the Commission recommended a one-year suspension in lieu of disbarment.

Both respondent and the State Bar appealed from the Commission's decision. We have jurisdiction pursuant to Ariz. Const. art. 3.

### Discussion

#### 1. Standard of review

In disciplinary proceedings we act as an independent "trier of both fact and law in the exercise of our supervisory responsibility over the State Bar." *In re Neville,* 147 Ariz. 106, 108, 708 P.2d 1297, 1299 (1985). We do, however, "give deference and serious consideration" to the reports of the committee and Commission. *In re Pappas,* 159 Ariz. 516, 518, 768 P.2d 1161, 1163 (1988).

#### 2. Hearsay argument

■ Respondent contends that the testimony of Louis' supervisor and Bridget's friend was inadmissible hearsay because it was offered to prove that respondent told the Castros about trial dates being set and bumped. We disagree.

As defined by rule 801(c), Arizona Rules of Evidence,

> "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

Conversely, a statement is *not* hearsay if "offered for some valid purpose other than to prove the matter asserted in the statement." *State v. Rivera,* 139 Ariz. 409, 413–14, 678 P.2d 1373, 1377–78 (1984); *see generally* 1 M. Udall & J. Livermore, *Arizona Practice: Law of Evidence* § 122 (2d ed.1982).

As the hearing committee correctly decided, the testimony of Louis' supervisor was not hearsay. The testimony was *not* offered to prove the truth of Louis' asser-

tion; i.e., that his case was set for trial. Rather, the testimony was offered to prove Louis *believed* his case was set for trial. As we have previously held:

> Declarations offered as circumstantial evidence of the declarant's state of mind are not hearsay at all because they are not offered to prove the truth of the declaration.

*State v. Williams*, 133 Ariz. 220, 228, 650 P.2d 1202, 1210 (1982).

■ Based on this principle, the testimony was admissible for the limited purpose of showing that Louis believed a trial date had been set and acted accordingly. The statement is therefore relevant because it lends credibility to Louis' testimony that respondent told him of the trial dates.

Using the same analysis, the testimony of Bridget's friend also was admissible. The hearing committee did not err by admitting the testimony. *See* rule 54(b), Rules of the Supreme Court (in disciplinary proceedings "the rules of evidence ... shall be followed as far as practicable").

■ Alternatively, the testimony may be characterized as nonhearsay in the form of a prior consistent statement by a witness. Rule 801(d)(1), Arizona Rules of Evidence, provides:

> A statement is not hearsay if ... [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive.

Prior consistent statements may be admitted as substantive evidence for the purpose of rebutting attacks on a witness' credibility. *See State v. Martin*, 135 Ariz. 552, 554, 663 P.2d 236, 238 (1983). However, in order to be admissible, the statement must be made before a motive to fabricate arises. *Martin*, 135 Ariz. at 554, 663 P.2d at 238; *see also State v. Jeffers*, 135 Ariz. 404, 423–24, 661 P.2d 1105, 1124–25 (1983).

Louis and Bridget, the declarants, testified at the committee hearing and clearly were subject to cross-examination concerning their statements. Additionally, respondent had made an implied charge that declarants fabricated their accounts of the hearing and arbitration dates of which respondent allegedly notified them. Ms. Greer, the hearing committee chairperson, noted that she would "allow some testimony regarding what the Castros said on several bases, but one is, basically to rebut a charge of recent fabrication." At that time, she gave respondent's counsel an opportunity to deny that he alleged recent fabrication, but no such denial was made. Furthermore, during cross-examination of the declarants, respondent's attorney impeached their credibility relating to the alleged hearing and arbitration dates. For example, he challenged Bridget Castro's recollection of hearing dates in unrelated legal matters in order to "look into and present to this Committee, her frame of mind and her credibility when she said that she was constantly ... told of hearing dates and being bumped." This clearly constitutes an implied charge of recent fabrication. Furthermore, the declarations were made before a motive to fabricate existed, and therefore are admissible as prior consistent statements.

### 3. *Louis Castro's "recantation"*

■ Respondent contends that Louis Castro's recantation indicates that his testimony before the hearing committee was perjured and should result in dismissal of the charges against him. For this reason, he argues, the Commission erred by neither considering Louis' sworn statement and affidavit nor remanding the matter to the committee for its decision.

■ Rule 53(d)(1) provides: "Evidence not presented to the committee shall not be presented to the commission." We do not believe this rule absolutely precludes State Bar counsel or a respondent from offering to the Commission evidence not presented to the committee where it properly falls into the category of newly discovered evidence. If the Commission finds the prof-

fered evidence should be considered by the committee, it may remand the matter for that purpose.

In our role as independent trier of fact in these proceedings, we have reviewed the sworn statement and affidavit. We do not find that the recantation warrants the inference that Louis gave perjured testimony before the committee. Respondent offered ample testimony before the committee to support his contention that Louis is a compulsive liar. In its report, the committee found that, although not all of Louis' testimony was credible, the "basic story was corroborated in all important aspects by independent evidence." In fact, although Louis and Bridget were divorced and had not spoken to each other in the 3 years preceding the disciplinary hearing, their testimony before the hearing committee was consistent.

We do not believe the Commission erred by refusing to consider the proffered recantation, which, it stated, "is not deemed newly discovered evidence." *See In re Spear,* 160 Ariz. 545, 550, 774 P.2d 1335, 1340 (1989) (Commission did not err by refusing to admit affidavit not offered at committee hearing; on review, court found the affidavit possessed little, if any, probative value).

### 4. *The false affidavit*

■ However, even if Louis' recantation is considered, the allegations of Count 5—the false statements contained in respondent's response and the affidavit—remain, independent from those contained in Counts 2 through 4. Respondent's response, which was filed *in propria persona,* explained the docketing procedures used by respondent's firm, and gave the following justification for his failure to answer:

> [T]he complaint at hand was served with correspondence that was marked "Confidential," because it was a State Bar of Arizona complaint. This being the first State Bar of Arizona complaint to be served in our office, and it being marked "Confidential," Ms. Valdez [respondent's docketing secretary] assumed that the

docketing procedure would be handled by me.... The docket secretary took no steps to docket or calendar when an answer was due in this matter, and the complaint was placed in the office file concerning this matter.

> I assumed the complaint had been docketed and calendared for an answer.

Ms. Valdez' affidavit, which respondent prepared without consulting her, recited the following:

> 1. I am the docketing secretary for the law firm of Fresquez & Fresquez.
>
> 2. The State Bar of Arizona complaint concerning Joseph E. Fresquez was served at our office with correspondence that was marked "Confidential."
>
> 3. I have never dealt with a confidential State Bar complaint.
>
> 4. Since the complaint was confidential, I did not calendar or docket when an answer would be due to the complaint.
>
> 5. The complaint was placed in the office file, and was brought to no one's attention until receiving Notice of Failure to File Answer on June 24, 1987.

On their face, these two documents would lead one to believe that the cause of respondent's failure to answer timely was his secretary, who never had handled a State Bar complaint before and had failed to follow office procedures.

However, Ms. Valdez' testimony before the hearing committee gives a different account of the events surrounding the State Bar complaint. Ms. Valdez was not served with the complaint; rather, respondent received the complaint directly from a deputy sheriff. Respondent did not give the complaint to Ms. Valdez for docketing and filing; in fact, Ms. Valdez knew nothing about the complaint until respondent handed her the handwritten response and affidavit for typing. In her testimony, she expressed her frustration at being unjustly blamed for failing to docket the complaint.

Ms. Valdez had *no* knowledge regarding the three operative paragraphs in her affidavit. *Cf.* Arizona Rule of Civil Procedure 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge"). Respondent prepared the affidavit, and Ms.

Valdez testified that she "read it over real quick and didn't take time to read it over carefully." Her affidavit asserts (¶ 2) that the complaint was served at her office with confidential correspondence, (¶ 4) that she did not calendar or docket when an answer would be due because the complaint was confidential, and (¶ 5) that the complaint was placed in the file and "brought to no one's attention." Her testimony at the hearing demonstrates that she knew nothing about these matters until respondent presented her with the affidavit for typing and signing.

Respondent's response and his secretary's affidavit were artfully crafted so that each operative paragraph had a gloss of candor and reasonability. Taken as a whole, and considering their use before the committee, however, the documents clearly were untruthful and intended to mislead the committee. In a prior case, we disbarred an attorney found guilty of several ethical violations, "most importantly a lack of candor before the Commission and the Committee." *In re Douglas,* 158 Ariz. 516, 523, 764 P.2d 1, 8 (1988).

### Determining the Appropriate Sanction

 Although we give great weight to the recommendations of the committee and Commission, this court ultimately is responsible for determining the appropriate sanction. *Neville,* 147 Ariz. at 115, 708 P.2d at 1306. Guiding our decision is the principle that "the purpose of bar discipline is not to punish the lawyer but to deter others and protect the public." *In re Kersting,* 151 Ariz. 171, 179, 726 P.2d 587, 595 (1986). The American Bar Association's *Standards for Imposing Lawyer Sanctions* (1986) also aids our decision. *In re Arrick,* 161 Ariz. 16, 22, 775 P.2d 1080, 1086 (1989). The *Standards* provide that a court should consider the following factors in determining the appropriate sanction to impose: (a) the duty violated, (b) the lawyer's mental state, (c) the actual or potential injury caused by the lawyer's misconduct, and (d) the existence of aggravating or mitigating factors. ABA Standard 3.0.

Counts 2 through 5 all relate to conduct "involving dishonesty, fraud, deceit or misrepresentation," in violation of DR 1–102(A)(4) and ER 8.4(c). ABA Standard 4.62 provides:

> Suspension is generally appropriate when a lawyer knowingly deceives a client, and causes injury or potential injury to the client.

However, ABA Standard 5.11(b) states that disbarment generally is appropriate when

> a lawyer engages in any … intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.

The hearing committee reported that it considered the following factors in recommending disbarment:

1. The duty violated was the duty to avoid conduct involving dishonesty, fraud, deceit or misrepresentation. This duty is perhaps the most fundamental ethical duty of a lawyer and is correspondingly supremely important.

2. The respondent's mental state was one of self-protection at all cost with no thought for his clients' financial or emotional welfare.

3. The potential injury to his clients could have been failure to recover on their civil damage action, but actual financial injury was negligible.

In addition, the committee found the following aggravating factors: (1) a dishonest or selfish motive; (2) a pattern of misconduct; (3) multiple offenses; (4) bad faith obstruction of the disciplinary proceeding; (5) submission of false evidence, false statements or other deceptive practices during the disciplinary proceeding; (6) refusal to acknowledge the wrongful nature of his conduct; and (7) the vulnerability of the victim, Louis Castro.

The committee found no mitigating factors sufficient to justify reducing the degree of discipline to be imposed.

### Disposition

We agree with the hearing committee's findings, and concur in its assessment of respondent's case:

The committee believes it is truly unfortunate that the initial allegation in the original bar complaint probably would not have been sustained (as it was not). However, respondent's numerous lies to the State Bar and before the committee under oath, and his lies when truth would have served him better, utterly destroyed his credibility with the committee. The committee could understand the temptation and human failing involved in respondent's early misrepresentations. At some point, however, respondent should have come clean. Instead he came before the committee and testified falsely under oath. It is difficult to conceive of an ethical violation more serious than a lawyer lying under oath.

We do not believe that *In re Kleindienst,* relied on by the Commission in recommending suspension, is dispositive of the sanction to be imposed in this case. In that case, this court suspended an attorney for one year for making false statements during disciplinary proceedings. *See Kleindienst,* 132 Ariz. at 102, 644 P.2d at 256. As we noted a year later, "if Mr. Kleindienst got less than he deserved, we do not propose to make the same mistake twice." *In re Wines,* 135 Ariz. 203, 207 n. 5, 660 P.2d 454, 458 n. 5 (1983). *Kleindienst* clearly is no longer the standard by which respondent's sanction should be measured.

The allegations contained in Count 5 were established by clear and convincing evidence and are, standing alone, sufficient to warrant respondent's disbarment. When coupled with the allegations contained in Counts 2 through 4, also established by clear and convincing evidence, the case for disbarring respondent is compelling.

Because of respondent's pattern of fraudulent conduct regarding his clients and his lack of candor during disciplinary proceedings, we disbar respondent effective on the date of the mandate in this case. Pursuant to rule 53(e)(3), respondent is assessed costs incurred by the State Bar in the amount of $8,036.98.

GORDON, C.J., FELDMAN, V.C.J., MOELLER, J., and TRUMAN, Superior Court Judge, Pima County, concur.

Justice JAMES DUKE CAMERON did not participate in the determination of this matter.

Pursuant to Ariz. Const. art. 6, § 3, Judge ALICE TRUMAN, a judge of the Superior Court of Arizona in Pima County, was designated to sit in his stead.