830 P.2d 462

**In the Matter of Dennis M. BREEN, III, a Member of the State Bar of Arizona, Respondent.**

**No. SB–90–0043–D.**
**Disciplinary Commission No. 5–2170.**

Supreme Court of Arizona.

April 14, 1992.

A formal complaint was filed against Respondent, and a hearing was held before State Bar Local Hearing Committee 5–D ("Committee"). The Committee concluded that Respondent violated several ethical rules by repeatedly engaging in activities which resulted in obvious existing and potential conflicts of interest. The Committee recommended that Respondent be suspended from the practice of law for two years and that, as a condition of reinstatement, he be required to pass the State Bar exam on the subject of ethics and successfully complete either twelve hours of continuing legal education in the field of ethics or a course in ethics at an accredited law school. Respondent objected to the Committee's Findings of Fact, Conclusions of Law, and Recommendations. Those objections were heard by the Disciplinary Commission ("Commission") which voted to affirm and adopt the Committee's determination. Respondent appeals from the Commission report. We have jurisdiction pursuant to Rule 53(e).

State Bar of Arizona, Harriet L. Turney, Chief Bar Counsel, Phoenix, and DeConcini McDonald Brammer Yetwin & Lacy, P.C. by Spencer A. Smith, Tucson, for State Bar of Arizona.

Slutes, Sakrison, Even, Grant & Pelander, P.C. by Tom Slutes, Tucson, for respondent.

## OPINION

CLABORNE, Court of Appeals Judge, Department E.

The State Bar of Arizona charged Dennis M. Breen, III, Respondent, with several violations of the Arizona Code of Professional Responsibility, Rule 29(a), Arizona Rules of the Supreme Court, 17A Ariz.Rev. Stat.Ann. ("A.R.S.") (1973).[1]

## FACTS

In exercising our supervisory power over the State Bar and its members, we review the proceedings as an independent trier of both fact and law. *In re Pappas*, 159 Ariz. 516, 518, 768 P.2d 1161, 1163 (1988). We are guided by a standard of clear and convincing evidence while giving deference and serious consideration to the findings and recommendations of the Committee and Commission. *Id.* The Committee and the Commission concluded that Respondent had violated several Disciplinary Rules, including 5–104(A), 5–105(A) and (C), and 7–101(A)(3).[2] These rules regulate a lawyer's business relationships with a client (5–104(A)), multiple representation of adverse interests (5–105), and the zealous representation of clients (7–101).

1. Because respondent's conduct occurred before February 1, 1985, former Rule 29(a) (Arizona Code of Professional Responsibility), rather than current Rule 42 (Arizona Rules of Professional Conduct) governs respondent's conduct. Order Deleting Rules 27 Through 49, of the

Supreme Court, and Substituting Amended Rules 27 Through 121, Rules of the Supreme Court, In Their Place, *reprinted in* 17A A.R.S. at 212 (1988).

2. See Appendix A.

Respondent was admitted to the Arizona bar in 1978. Before admission to the Arizona bar, the Respondent was licensed to practice law in New York State. He worked in New York in an investor capacity. The facts in this matter arise from Respondent's representation of a husband and wife ("the clients") from 1979 to 1982. In 1985, the clients successfully prosecuted a malpractice action against Respondent in the Pima County Superior Court and were awarded a judgment against Respondent for approximately $90,000.

Respondent's violations arise out of seven different matters, each of which was considered in detail by the Committee and Commission. Since the ethical violations in some of the matters are the same, we elect not to outline each matter, but discuss three which we find representative.

Respondent formed the Albert Hubbell ("Hubbell") Corporation on behalf of the clients for the purpose of obtaining capital for investment. Respondent was the attorney for Hubbell. Respondent also became a shareholder and treasurer of Hubbell but did not fully disclose to the clients · his potential conflicts of interest with respect to his participation as both a shareholder/officer and attorney of the corporation.

At the same time, Respondent was corporate attorney for C & T Air Conditioning ("C & T") as well as the personal attorney for Frank Trenary, owner of C & T. Respondent obtained a $75,000 loan from Hubbell for C & T, telling the clients that security for the loan would consist partly of a deed of trust in second position on Trenary's home. However, the security obtained on Trenary's home was in fact a third position deed of trust.

Respondent never fully disclosed to the clients that he also represented C & T and Trenary. Respondent also failed to follow the clients' directions with respect to collection of the loan from C & T. Respondent received checks from C & T in payment of the loan, which, in his capacity as treasurer of Hubbell, he signed back over to C & T to help it continue operations, without the clients' consent. The Committee found Respondent had violated DR 5–104(A) and DR 5–105(A), a finding which the Commission affirmed.

In another transaction, Respondent negotiated a loan from Hubbell to Jack Macy ("Macy") which was secured by a deed of trust on thirteen acres of property. The clients directed Respondent to draft the terms of the loan for $90,000 at 25% interest. Instead, Respondent negotiated the loan for $100,000 at 15% interest. An additional $10,000 premium was charged on the note. Respondent never disclosed to the clients the difference in the terms.

Macy eventually defaulted on the loan and the clients began foreclosure proceedings. At this time, Respondent no longer represented the clients or Hubbell. Nine days before the scheduled Trustee's Sale on the Macy property, Respondent filed a Chapter 11 bankruptcy petition on behalf of Macy to prevent the sale, an action directly adverse to his former clients (the couple referred to here) and Hubbell. Respondent never informed his former clients of his intent to represent Macy, nor had he obtained their consent. Respondent stated that he believed a provision of the bankruptcy code, 11 U.S.C. section 327(C), permitted him to represent Macy even though he had an obvious conflict of interest. The Committee found that the bankruptcy code does not release an attorney from his or her duties under the Arizona ethical regulations, relying in part on *In re Greater Pottstown Community Church of the Evangelical Congregational Church*, 80 B.R. 706 (Bankr.E.D.Pa.1987), and that Respondent's representation of Macy violated DR 5–105(A). · The Committee found that Respondent also violated DR 7–101(A)(3), and the Commission affirmed both findings.

In another transaction, while acting as an investment broker, Respondent urged the clients to invest in two oil ventures, Pioneer Oil and Viola Oil. Respondent received a commission on all investments he raised in the form of credits toward his own investment, a fact known to the clients. However, in connection with the investments, Respondent never obtained competitive bids on the drilling contracts

nor did he conduct independent investigations of geology reports from the drillers. The ventures were managed by persons with no experience in the oil business, a fact known to Respondent. None of the drilling produced any oil. The Committee found that although acting as a businessman rather than an attorney in this matter, Respondent was to be held to the same standard of ethics and competence in any transaction with a client as if he were actually acting as an attorney, citing *In re Pappas*, 159 Ariz. 516, 522, 768 P.2d 1161, 1168 (1988). The Committee then found that Respondent failed to act as a reasonable attorney in exercising his professional judgment for the protection of his clients, a violation of DR 5-104. The Commission affirmed this decision.

## DISCUSSION

### 1. *The Violations*

█ We have reviewed the entire record and we find that it supports the Commission findings by clear and convincing evidence. The three representative cases are violations of our ethical rules. In both the Hubbell–C & T loan and the Hubbell–Macy transaction, a business relationship was the basis of the agreement. In each case there were differing interests between the clients and the Respondent. Differing interests is defined as

> every interest that will adversely affect either the judgment or the loyalty of a lawyer to a client, whether it be a conflicting, inconsistent, diverse, or other interest.

Code of Professional Responsibility, Definitions § 1, *reprinted in* Rule 29(a). *See In re Pappas*, 159 Ariz. 516, 523, 768 P.2d 1161, 1168 (1988).

Also, the rule requires full disclosure. In the Hubbell–C & T loan the record confirms that Respondent did not tell the clients that the security (a deed of trust) for the $75,000 loan was in third rather than second position and Respondent never disclosed that he was the attorney for the entity receiving the loan.

In the Hubbell–Macy transaction, the terms of the loan were substantially changed by Respondent both as to the principal sum loaned and the interest charged. Beyond this, the claim that the bankruptcy code insulated Respondent from his ethical duties is simply wrong.

In the *Greater Pottstown Community Church* case, the court, in speaking of conflicts of interest said:

> We believe that the 1984 Amendment to 11 U.S.C. § 327(c), as explained by Norton's later work, only allows an independent trustee to hire the same counsel as formerly was employed by a creditor if perchance no conflict exists in counsel's doing so. It does *not*, however, and could not, alter the fundamental principle established by the Supreme Court in *Woods* [*v. City National Bank & Trust Co.*, 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820 (1941)] and *Mosser* [*v. Darrow*, 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951)] that any apparent or actual conflict of interest cannot be tolerated.

80 B.R. at 711.

Finally, the two oil ventures point up an additional ethical consideration when a lawyer enters into a business venture with a client. Although Respondent's clients knew he was receiving commissions on their oil investments, he did not act as a prudent businessman. There was never a competitive bid on the oil drilling contracts, the people managing the properties had no experience in the oil business, and there was never a real investigation concerning the geology of the area where the wells were to be drilled. A drilling that produced oil would actually have been a surprise. We have often said a lawyer's intent of acting with improper motives is not material to the application of DR 5-104. *In re Neville*, 147 Ariz. 106, 112, 708 P.2d 1297, 1303 (1985). What is important is that clients are entitled to depend on the fairness of their lawyers and know they have some reasonable amount of protection. *Id.* Certainly, competitive bidding, selecting people who have experience in the oil business, and investigating the structure and composition of the drilling area are basic to

oil development. Respondent urged his clients to enter into two oil ventures which had not followed these basic oil business practices, while obtaining a personal advantage by way of the commissions paid on these investments.

It cannot be said that these investments were not questionable. They were. Respondent could not have known whether the oil ventures were good or bad since he made no rudimentary investigation. When a lawyer has this lack of information and fails to disclose it to his client, he can do substantial harm to his client. Full disclosure to a client under DR 5–104(A) requires that the attorney give the client specific advice about the need to seek independent counsel and explain to the client in detail all risks associated with the business transaction. *In re Spear*, 160 Ariz. 545, 554, 774 P.2d 1335, 1344 (1989). As *Spear* indicated, clients, sophisticated or not, rely upon the judgment of their lawyers even though the particular transaction may involve no legal advice. Here, Respondent received a commission for obtaining his clients as investors in an oil venture. Even though Respondent completely disclosed the commission, the fact remains that his clients had or should have had a reasonable belief in their lawyer's judgment. It is our belief that even though there was a full disclosure by Respondent, the fiduciary relationship between lawyer and client still existed. The facts support the perception that the clients believed they were dealing with "a person whose advice and counsel should be given weight and respect, rather than as one whose words must be taken with that grain of salt that the law expects

from people dealing with those who are not fiduciaries." *See Spear*, 160 Ariz. at 554, 774 P.2d at 1349 (citing *Neville*, 147 Ariz. at 112, 708 P.2d at 1303). *See also Pappas*, 159 Ariz. at 522–23, 768 P.2d at 1167–68. We have said that the better rule may be to completely prohibit lawyer-client business dealings.[3] Yet,

> The practical difficulties with such an absolute bar ... prevents its enactment. As a general rule, and to minimize ethical problems, no lawyer should allow a client to invest or otherwise participate in the lawyer's business ventures unless the client obtains independent legal advice. Nothing else will protect our profession's integrity and the public interest. *Pappas*, 159 Ariz. at 522, 768 P.2d at 1167

*Spear*, 160 Ariz. at 554, 774 P.2d at 1344.

■ Therefore, we do not now impose an absolute bar on this type of transaction. We wish, however, to emphasize that when a lawyer receives a personal benefit apart from the client's fee from a transaction in which he represents a client, the lawyer's ethical obligation is not always fulfilled by merely disclosing the existence of the personal stake, explaining the potential consequences, and obtaining the client's consent. There is an inherent potential for a conflict of interest in such situations, and the lawyer must always ensure that his or her personal interest does not interfere with the unfettered exercise of professional judgment the client is entitled to expect under the circumstances. The best way to achieve this, of course, is to see that the client has independent advice.[4]

3. Courts and legal scholars seem to believe that the fiduciary relationship of lawyer and client requires a test that is demanding of the lawyer and tolerant and forgiving of the client. *See* C. Wolfram, Modern Legal Ethics § 8.11.1, 8.11.2, 8.11.3 pp. 479–82; *In re Kali*, 124 Ariz. 592, 595, 606 P.2d 808, 811 (1980); *In re Weiner*, 120 Ariz. 349, 352, 586 P.2d 194, 197 (1978); *Greene v. Greene*, 56 N.Y.2d 86, 451 N.Y.S.2d 46, 49, 436 N.E.2d 496, 499 (1982).

4. The current ethical rule, ER 1.8(a), is more explicit than former DR 5–104:
(a) A lawyer shall not enter into a business transaction with a client or knowingly acquire

an ownership, possessory, security or other pecuniary interest adverse to a client unless: (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client; (2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and (3) the client consents in writing thereto. ER 1.8(a), Rule 42.

With the gradual disappearance of rural America and the advancing complexities of modern life, the reason for continuation of less than a complete prohibition of lawyer-client business dealings may also be disappearing.

We feel the Committee and Commission findings are reasonable, that they are justified by the entire record, and we therefore adopt all of them.

## 2. *The Sanctions*

Still, we must decide whether to impose the Commission's recommended sanctions. Although Respondent disputes some of the facts found by the Committee and the Commission, the record supports the findings made.

We begin with the reason for attorney discipline. The purpose of discipline is not to punish the offender, but to protect the public and deter other attorneys from the same kind of conduct. *In re Rivkind*, 164 Ariz. 154, 157, 791 P.2d 1037, 1040 (1990). In deciding the type of sanction, if any, that should be imposed, we consider a number of factors. These factors include the duty violated, the mental state of the lawyer, the potential or actual injury caused by the misconduct, and the existence of aggravating or mitigating factors. *In re Anderson*, 163 Ariz. 362, 365, 788 P.2d 95, 98 (1990) (citing The American Bar Association's *Standards for Imposing Lawyer Sanctions* (1986)); *In re Fresquez*, 162 Ariz. 328, 334, 783 P.2d 774, 780 (1989).

A review of the Committee findings, adopted by the Commission, relating to the factors which should be considered are revealing. The Committee, in dealing with the duty which a lawyer owes to his client, said:

> We are forced to conclude that either the Respondent has no concern for the rules of ethical conduct which preclude him from engaging in conflicts of interest, or he is incapable of recognizing those situations where actual or potential conflicts of interest exist.

Concerning the mental state of the lawyer and the potential or actual injury to the client, we again agree with the Committee when it said:

> We are also deeply concerned with the "no harm, no foul" attitude displayed by the Respondent. Respondent repeatedly states that his activities either helped the client or did not hurt the client.
>
> .  .  .  .  .
>
> The results of this behavior can have no other effect than to diminish the confidence a client has in his attorney and to detract from the integrity of the legal profession, not only in the eyes of the one or two clients whose interests were compromised, but in the eyes of the public at large.
>
> .  .  .  .  .
>
> [W]e conclude that no matter what the sophistication level of a client it is *never* the client's duty to recognize a conflict of interest, nor is it the client's duty to seek out such information. No matter what the education level or the sophistication of a client, it is always the attorney's duty to fully disclose the existence or potential for conflict of interest to avoid such conflicts, and to obtain, if necessary, a full waiver of such conflict.

Finally, we agree with the Committee that Respondent was not completely motivated by greed or evil intentions. However, he did benefit by these obvious conflicts of interest no matter how sophisticated his clients may have been. The Committee and the Commission both felt that even setting aside the attitude of the Respondent and the obvious nature of the conflict, the lack of evil intentions or greed was sufficient to rule out disbarment. The Committee said:

> Having reviewed the ABA Standards we note that Section 2.8 gives an example of similar misconduct. In that example a one year suspension from the practice of law was recommended. We note however, that the example set forth by the ABA involved one isolated incident. We are extremely disturbed by the repeated series of misconduct and the other aggravating factors mentioned above. We therefore recommend that the Respon-

dent be suspended from the practice of law for a period of two years.

On balance we feel that the Committee and the Commission had more than sufficient evidence to justify the sanction which they felt was appropriate. We agree with the Committee and Commission and impose a two-year suspension with the requirement that reinstatement will be conditional upon passing the Arizona Bar ethics exam and successfully completing either twelve hours of continuing legal education in the field of ethics or a course in ethics at an accredited college of law. The suspension shall commence on the date the mandate in this case is issued. The Respondent is also ordered to pay the Arizona State Bar the amount of $2,833.13 for costs and expenses incurred in this matter.

FELDMAN, C.J., and MOELLER, V.C.J., concur.

CORCORAN, Justice, dissenting:

I respectfully dissent. Respondent's misconduct in 7 separate instances occurred between 1979 and 1982. His misconduct was not reported to the State Bar of Arizona until August 1985, when some of the clients successfully prosecuted a malpractice action against him in Pima County Superior Court and were awarded a judgment of approximately $90,000.00. The trial judge, Robert Buchanan, and one of the clients filed a complaint with the State Bar. *See* Canon 3(B)(3), Arizona Rules of Professional Conduct; *In re Himmel*, 125 Ill.2d 531, 127 Ill.Dec. 708, 533 N.E.2d 790 (1988).

Although an order of probable cause was issued by bar counsel on March 21, 1986, a formal complaint was not filed until January 24, 1989. This "dead" time resulted in large part because of the difficulty Chief Bar Counsel had in securing volunteer bar counsel. Two attorneys were appointed before Mr. Smith was secured to act as volunteer bar counsel. Since then, he has handled this case expeditiously. It may be necessary for the State Bar of Arizona to hire more attorneys to staff a trial section in bar counsel's office.

I believe that Respondent's egregious misconduct requires disbarment. I agree with the hearing committee of the State Bar which concluded:

> We believe that Respondent failed to rise even to the level of ethics required of the average business man, and we believe that, as an attorney, Respondent should have adhered to a higher standard of ethics than that expected of a member of the general public.

Respondent should be disbarred.

FRANK X. GORDON, Jr., J. (Retired) and JAMES DUKE CAMERON, J. (Retired) did not participate in this matter. JOHN L. CLABORNE, J., Court of Appeals, Division One, was designated to sit in the place of GORDON, J. under Ariz. Const. art. 6, § 3.

## APPENDIX A

**Disciplinary Rules which were in force during the period involved.**

DR 5–104(A):

> A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

DR 5–105:

> (A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).

> .    .    .    .    .

> (C) In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representa-

tion on the exercise of his independent professional judgment on behalf of each.

DR 7-101:

(A) A lawyer shall not intentionally:

. . . . .

(3) Prejudice or damage his client during the course of the professional relationship except as required under DR 7-102(B).